Exhibit A



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION


CIVIL ACTION NO. 2:25-CV-235


KELLI DAVIS, ON BEHALF OF HERSELF

AND ALL OTHERS SIMILARLY SITUATED,

    PLAINTIFF

vs.

CAPSTONE CYPRESS OPCO, LLC

D/B/A CYPRESS PLACE ASSISTED LIVING,

MME CAPITAL HOLDINGS, LLC AND BEJE

FOSTER, INDIVIDUALLY,

    DEFENDANTS


30(B)(6) DEPOSITION OF:

CORPORATE REPRESENTATIVE

AMANDA DARNELL

February 11, 2026

10:38 A.M.


REPORTED BY:

CINDY C. JENKINS, CCR

A  P  P  E  A  R  A  N  C  E  S


APPEARING ON BEHALF OF THE PLAINTIFF:
WELMAKER LAW, PLLC
Mr. Douglas B. Welmaker
505 Magrill Street.
Longview, Texas 75601
512-799-2048
doug@welmakerlaw.com


THE BUENKER LAW FIRM
Mr. Joe Buenker
Post Office 10099
Houston, Texas 77206
713-335-4653
jbuenker@buenkerlaw.com


APPEARING ON BEHALF OF THE DEFENDANTS:
HALLETT & PERRIN, P.C.
Ms. Elizabeth M. Reed
1445 Ross Avenue
Suite 2400
Dallas, Texas 75202
214-953-0053
ereed@hallettperrin.com

ALSO PRESENT:
Mr. Christopher Rosskopf

                    I N D E X

WITNESS                                    PAGE

AMANDA DARNELL

Examination by Mr. Welmaker            5

Examination by Ms. Reed              60

Re-Examination by Mr. Welmaker       61

Re-Examination by Ms. Reed           64

Re-Examination by Mr. Welmaker       65

             INDEX OF EXHIBITS

NUMBER        DESCRIPTION                  PAGE

Exhibit 1   Notice of Deposition          10

Exhibit 2   Arbitration Policy and Proc.  30

Exhibit 3   Arbitration Policy and Proc.  45

Exhibit 4   Operations Transfer Agreement 62

PROCEEDINGS

FEBRUARY 11, 2026                    10:38 A.M.


COURT REPORTER:  All right, everyone.  Good morning.  My name is Cindy Jenkins.  I'm the court reporter here also on behalf of Steno.  I do have the federal stipulation I'm going to put on the record really quickly.  The parties and their counsel further agree that, while I'm a licensed notary and court reporter, the witness may be in a state where I'm not licensed.

The parties stipulate that the deposition may be taken before me.  If any party does have an objection to this manner of reporting or anything stated above, please state so now.

Okay.  Hearing none, we can proceed.

AMANDA DARNELL,
having been duly sworn,
testified as follows:

MS. REED:  Doug, may we agree on the record that objecting to form will preserve my objections?

MR. WELMAKER:  Yes.

MS. REED:  Thank you.

COURT REPORTER:  All set for questioning when you're ready, Mr. Welmaker.

EXAMINATION BY MR. WELMAKER:

Q.    Okay.  I know you've already told us your name, but can you go ahead and tell us your name one more time for the record?

A.    Sure.  It's Amanda Darnell.

Q.    All right.  Thank you, Ms. Darnell.

I'm sure that your attorney has gone over the basic ground rules for depositions, but just in case you've forgotten them or just to make everything go as smoothly as possible, I'm just going to go over a couple of ground rules that will help us -- the process move along much quicker.

If you don't understand a question that I've asked, please let me know, and I'm more than happy to re-ask it or rephrase it to where you do understand it, okay?

A.    Okay.

Q.    If you do answer a question, I'm going to assume that you understood it.  Is

that okay?

A.      Yes.

Q.      Okay.  Your answers need to be like you have been giving them, a yes, no, whatever else.  The only thing that makes it hard for the court reporter is when a witness says uh-huh or huh-uh, which is real hard for the court reporter to get down.  So please keep that in mind when you answer my questions.

This is not a marathon deposition. I'm going to try to get this over with as quickly as possible.  And in the meantime, if you need to take a break for any reason, just please let me know.  The only thing I'll ask you is that you let me -- or that you finish answering a question that I have asked if one is pending, and then we can stop after that. So please feel free to just let me know.

I'm sure that your counsel will go over additional ground rules or guidelines when she takes you on redirect, but I think that basically covers it for the moment.

Can you tell me who your employer is?

A.      Capstone Healthcare.

Q.      Okay.  And when you say "Capstone Healthcare," is there a more detailed description or entity like Capstone Healthcare, LLC or Capstone Healthcare Opco, LLC, or anything like that?

A.      We commonly refer to the company as Capstone Healthcare.  I would have to look at the EIN document, it sounds like, is what you're potentially asking.  Am I understanding that correctly?

Q.      Yes.  I want to know the specific entity that employs you.  And if more than one entity employs you, I would like to know that too.

A.      I would have to look at that document to get you the specific answer.

Q.      Okay.  Do you recall whether there's a specific name on your paychecks or your W-2 that you receive?

A.      I don't recall.  I haven't -- no, I don't recall an exact name.

Q.      Okay.

MR. WELMAKER:  Elizabeth, maybe during a break, we can try to figure that out

because I think that's important for today's deposition.

MS. REED:  Sure.

Q.    (By Mr. Welmaker) Okay.

So Ms. Darnell, in what capacity are you appearing here today?

A.    I'm appearing as a witness on behalf of Capstone Healthcare.

Q.    Okay.  Are you appearing on behalf of any other entities?

A.    It would have to be any of our -- Capstone Healthcare Cypress.

Q.    Okay.  Are you employed by Capstone Healthcare Cypress?

A.    I'm employed by Capstone Healthcare.

Q.    Okay.  Is there a specific entity called Capstone Healthcare Cypress, like Capstone Healthcare Cypress, LLC, or anything like that?

A.    That's another one I would have to look at specifically to get you the accurate answer.

Q.    Okay.  So do you understand that you are here today in a capacity as the

corporate representative --

A.     Yes.

Q.     -- or as a corporate representative, and your answers will be binding on Capstone Healthcare?

A.     Yes, I do.

Q.     And you're not necessarily testifying in your individual capacity, you're testifying in your representative capacity?

A.     Yes.

Q.     Okay.

A.     Actually, I'm sorry, can you explain the difference between the individual capacity and the representative capacity?

Q.     You're here testifying -- and your attorney can correct me if I'm wrong or if she disagrees.  You're here testifying on behalf of Capstone-Cypress Opco, LLC; is that correct?

MS. REED:  I can stipulate on the record that that's correct.

MR. WELMAKER:  Okay.  And let's just go ahead and introduce Exhibit No. 1 Ms. Jenkins.

COURT REPORTER:  Okay.

Mr. Welmaker, I think you have to share that from your screen, if I'm not correct -- the way he showed you how to share it.  Are you going to do it in the StenoConnect app?

MR. WELMAKER:  Yeah, I can absolutely do that.

COURT REPORTER:  Is that correct, Chris, that he needs to share his?

MR. ROSSKOPF:  That's correct.

(A short discussion was held.)

(Whereupon, Plaintiff's Exhibit 1 was marked for identification.)

Q.      (By Mr. Welmaker) Let's mark this as Exhibit 1.  This is the deposition notice that I forwarded to defense counsel in this matter for today's deposition.  Can everybody see it okay?

A.      Yes.

Q.      All right.  And have you, Ms. Darnell, taken a look at the second page where we list matters on which the examination is requested?

A.      Yes.

Q.      Okay.  And you've familiarized

yourself with all of the different topics that are listed here?

A.    Yes.

Q.    Okay.  And so you are going to be testifying on behalf of Capstone-Cypress Opco, LLC.  Do you see that on this document?

A.    I do see that.

Q.    Okay.  And do you agree that that's who you are testifying on behalf of?

A.    Yes.

Q.    Okay.  All right.

Now, I want to stop presenting that and just move forward.

Okay.  So if anybody needs to see any deposition exhibit that I use, please just let me know, and I'll put it back up.

Ms. Darnell, what did you do to prepare for this deposition today?

A.    I looked at the employee handbook.  I looked at the versions of the arbitration agreement and met with our counsel.

Q.    Did you look at any other documents?

A.    No.

Q.      Okay.  And how long did you meet with your counsel?

A.      About an hour and a half.

Q.      And when did you meet with her?

A.      Yesterday.

Q.      Did you talk to anybody else in preparation for this deposition?

A.      No.

Q.      Okay.  Have you ever testified in a corporate representative capacity before?

A.      I have not.

Q.      Have you ever testified in a deposition before?

A.      I have not.

Q.      Let me back up.  I should have mentioned this at the start.  My name is Doug Welmaker.  I am the attorney on behalf of Kelli Davis, who is currently one of the plaintiffs in the lawsuit against Capstone-Cypress Opco, LLC, et al.  And I think we may have spoken before at Ms. Davis' TWC hearing; is that correct?

A.      I believe so, yes.

Q.      All right.  I wasn't sure.

Okay.  So let's talk a little bit

about Capstone-Cypress Opco, LLC.  Do you know when it was created?

A.    I do not have that information, no.

Q.    Okay.  And that's one of the very first things that I mentioned on the matters on which the examination is requested on Exhibit 1.  So you are telling us you don't know when Capstone-Cypress Opco, LLC was created or formed; is that correct?

A.    I don't have that date, correct.

Q.    Okay.  Who would know that?

A.    I believe we've requested a document that should have the date on there.

Q.    And who did you request that from?

A.    We requested it from Matthew Moman.

Q.    Okay.  And who is Matthew Moman?

A.    He is the president.

Q.    So who created or formed Capstone-Cypress Opco, LLC?

MS. REED:  Objection.  Answer if you know.

THE WITNESS:  Oh, who created it? I would have to look at the document.  But am

I supposed to speculate here?

Q.      (By Mr. Welmaker) No.  I mean, the whole point of this was for me to list a number of topics for you to testify about, and then for you to either have that knowledge personally yourself or to have someone else tell you what the answers to those topics are just to bring you up to speed on all these things.

A.      Yeah.

Q.      So do you know anything about the creation or the formation or the history of Capstone-Cypress Opco, LLC?

A.      I mean, I can give -- I mean, anything -- and what -- I guess I know a lot about the entity itself.  I guess when you say "anything," I feel like you're referring to the -- the small specific that I don't have right now being the date of creation. So, I guess, if you don't mind clarifying what you mean by the "anything."

Q.      Okay.  Well, let me just -- I'll just go ahead and ask you some questions --

A.      Okay.

Q.      -- and we'll just see where that

takes us.

What was the purpose of creating the entity of Capstone-Cypress Opco, LLC?

A.    It would have been during the acquisition of the location.

Q.    And when you say it was created for the acquisition of the location, can you explain what you mean by that?

A.    The purchase of the real estate of that location would be my understanding.

Q.    So are you referring to the purchase of the facility at 100 West Douglas Street in Jefferson, Texas?

A.    Yes.

Q.    Okay.  Did you know that Capstone-Jefferson Propco, LLC purchased that building originally?

A.    No.

Q.    Okay.  Did you know who Capstone-Jefferson Propco transferred or sold the building to after it purchased it?

A.    No.

Q.    Okay.  Did you know that Capstone-Jefferson Propco, LLC sold the facility to Capstone-Cypress Propco, LLC?

A.    No.

Q.    Okay.  Do you know the history of the buying and selling of the property located at 100 West Douglas Street in Jefferson, Texas?

A.    I know, generally speaking, that it was acquired, but not the details, no.

Q.    And you don't know who acquired it or when they acquired it?

A.    No.

Q.    Okay.  And just for the record, those were some of the other topics that I listed in the 30(b)(6) deposition notice that we provided to your counsel.

Are you familiar with or do you recall looking at those topics when you reviewed the deposition notice, which has been marked as Exhibit 1?

A.    I do recall looking at Exhibit 1, yes.

Q.    How long did you look at Exhibit 1?

A.    About -- yesterday, about an hour and a half.

Q.    You looked at the exhibit for an

hour and a half?

A.    We had it in front of us while we discussed.

Q.    Okay.  So it's your testimony that Capstone-Cypress Opco, LLC was formed for the purpose of purchasing the facility at 100 West Douglas Street; correct?

A.    That's my understanding.

Q.    Okay.  Do you know who currently owns the facility at 100 West Douglas Street as we sit here today?

A.    I would assume it's the entity that you mentioned.

Q.    Which entity is that?

A.    The Cypress Place, the one that you referred to in your question prior.

Q.    Okay.  Well, Cypress Place is an assumed name; right?

A.    Right.  I meant the entity that you mentioned in your prior question.

Q.    But you can't tell me what entity that was; correct?

A.    Capstone-Cypress.

Q.    Okay.  Capstone-Cypress Opco, Capstone-Cypress PropCo, is it one of those?

A.    I'm not sure.

Q.    Okay.  Has the facility sold within the last year or in the last 18 months?

A.    No.

Q.    Okay.  So it is still owned today by a Capstone facility or entity?

A.    Yes.

Q.    Okay.  Do you know who the owners were prior to Capstone-Cypress Opco, LLC purchasing the building?

A.    No.

Q.    Okay.  In my deposition notice, I also asked in a subpoena duces tecum for you to bring a copy of the purchase agreement for the facility located at 100 West Douglas Street.  Did you bring that purchase agreement with you today?

A.    No.

Q.    Did you notice that I had asked for that in the deposition notice?

A.    Yes.

Q.    Okay.  Is there a reason why you didn't bring that purchase agreement with you?

A.    We requested it and just haven't received it yet.

Q.    Okay.  Well, I had planned to ask you some questions about that purchase agreement.  Do you know what the status is on obtaining that purchase agreement?

A.    I don't.

Q.    Who did you request it from?

A.    We requested it from Matt Moman.

MS. REED:  Do you want to go off the record for a second?

MR. WELMAKER:  Sure.

COURT REPORTER:  Yes, ma'am. Off the record.

(A short discussion was held.)

Q.    (By Mr. Welmaker) Okay.

And Ms. Darnell, can you tell me if you are in the process or your attorney is in the process of obtaining that purchase agreement that I requested in the subpoena duces tecum?

A.    Yes.

Q.    And what is the status of that?

A.    We should hopefully have it within the next hour, is our hope.  So we did contact Matt and ask him again to send it.

Q.    Okay.  And you will let me know

when you guys obtain that purchase agreement; correct?

MS. REED:  I will stipulate on the record that once we receive it, I'll send it over to you via e-mail.

MR. WELMAKER:  Okay.  With respect --

MS. REED:  It would be not Bates labeled.

MR. WELMAKER:  That's fine.

MS. REED:  But we can always supplement later and Bates label it later.

MR. WELMAKER:  Yeah, that's fine.

Q.    Okay.  So whatever Capstone entity purchased the facility, do you know when that purchase occurred?  And let's be clear, we're talking about the facility that is located at 100 West Douglas Street in Jefferson, Texas.

A.    I don't have the exact date.

Q.    Okay.  Do you have a roundabout date, an approximate date?

A.    I believe 2021.

Q.    And do you know if any of the employees that were working at the facility before the Capstone entity bought it remained

on?

     A.     Yes.  I believe that the vast majority, typically in these situations, tend to remain on.

     Q.     Was that the case in this particular situation?

     A.     I believe so, yes.

     Q.     Okay.  About how many remained on?

     A.     I don't have that exact number. Are you asking for an estimate?

     Q.     An estimate would be fine.

     A.     Okay.  We typically have around 20 to 25 on staff there at any given time. So I would estimate it would be around that same number.

     Q.     Okay.  But you don't have any personal knowledge about the number that came over from the prior entity?

          MS. REED:  Objection, form.  Go ahead and answer.

          THE WITNESS:  No.  I would have to look.

     Q.     (By Mr. Welmaker) And what would you look at?

     A.     I would have to go back and look

at the payroll records is probably where I'd start from that time frame.

Q. Okay. The entity that Capstone purchased the facility from, was it at all related to any of the Capstone companies or Capstone affiliates?

A. I don't have that information.

Q. Okay. One of the things that we said that we're going to talk about today are how Capstone-Cypress Opco, LLC is associated, if at all, with Capstone Healthcare.

So can you tell me how Capstone-Cypress Opco, LLC is associated with Capstone Healthcare?

A. Yes. Capstone-Cypress is one of the communities under Capstone Healthcare.

Q. Okay. And you don't know what specific entity owns or operates Capstone Healthcare; is that correct?

A. I don't have that information in front of me, no.

Q. Okay. And beyond just one of the communities that is under Capstone Healthcare, Capstone-Cypress Opco, LLC is an entity that -- is it a subsidiary entity?

A.    I'm not sure.

Q.    Is it a standalone entity?

A.    I'm not sure.

Q.    Okay.  When the arbitration agreements -- and we'll look at those in a second -- use the word "Capstone Healthcare and its affiliates," who specifically are the affiliates of Capstone Healthcare?

A.    Those would be the communities.

Q.    And what are their names?

A.    Our -- our -- You want me to tell you all the names of our different communities?

Q.    Sure.  I'd prefer the corporate entities that fall under the Capstone Healthcare umbrella.  Do you have that information?

A.    I don't.

Q.    Okay.  What are the names of the communities then?

A.    So we have Cypress Place Assisted Living, Capstone Healthcare Estates of Perryton, Capstone Healthcare Estates of Hughes Springs, Capstone Healthcare Estates of Daingerfield.  And I'm trying to -- I

think that's it.

Q. Okay. And can you tell me -- so if we're talking about the corporate affiliates under the umbrella of Capstone Healthcare, you don't know the names of any of the corporate affiliates; is that correct?

MS. REED: Object to form. You can answer.

THE WITNESS: I don't have the exact names, no.

Q. (By Mr. Welmaker) Do you have any part of the corporate names?

A. No.

Q. Okay. What is your position with Capstone healthcare?

A. I'm our corporate HR.

Q. Corporate HR.

So you are corporate HR for Capstone Healthcare; is that correct?

A. Yes.

Q. And so does that mean that you are corporate HR for all the different facilities that you just listed?

A. Yes.

Q. Okay. Does that mean you're

corporate HR for Capstone-Cypress Opco, LLC?

A.     Yes.

Q.     Okay.  So just off the top of your head, how many entities are you corporate HR for?

A.     Five.

Q.     Do you know if -- are you corporate HR for Capstone Healthcare Staffing?

A.     That is actually not -- I actually know that name because it's not one of our entities.  It's commonly mistaken with us.  We get a lot of phone calls for them. Capstone Healthcare Staffing is a totally different non-associated company.

Q.     Okay.  So do -- I'm going to ask you questions about a couple of the corporate entities under Capstone Healthcare.  And I just want to know if you can tell me whether any of these entities fall under the umbrella of Capstone Healthcare, okay?

A.     Okay.

Q.     Okay.  Capstone Healthcare of Perryton?

A.     That is one of our entities.

Q.     Okay.  Capstone Healthcare of

Daingerfield?

A.    Yes, that is one of our entities.

Q.    Capstone Healthcare Estates on Orem?

A.    No, that is no longer one of our entities.

Q.    Capstone Healthcare of Hughes Springs?

A.    Yes.

Q.    Capstone Healthcare Estates of Veterans Memorial?

A.    No.

Q.    Okay.  Capstone Health, Inc.?

A.    I do not know.

Q.    Okay.  Capstone Healthcare, LLC?

A.    I don't know.

Q.    Capstone Healthcare Management, LLC?

A.    Yes.

Q.    Capstone Healthcare Equipment Services, Inc.?

A.    I don't think so.

Q.    Capstone Health Ventures, Inc.?

A.    I Don't think so.

Q.    Capstone Houston Opco, LLC?

A.    No.

Q.    Capstone Hughes Springs Opco, LLC?

A.    Yes.

Q.    Capstone Hughes Springs Propco, LLC?

A.    I'm not sure.

Q.    Capstone VM Holdings, LP?

A.    No.

Q.    Capstone-Cypress Propco, LLC?

A.    I assume so.  I'm familiar with the Opco.

Q.    But not Propco?

A.    I can't say with certainty.

Q.    Capstone HC Management, LLC?

A.    Yes.

Q.    And Capstone Home Care, LLC?

A.    No.

Q.    MME Capital Holdings, LLC?

A.    I don't know.

Q.    Okay.  Have you ever heard of MME Capital Holdings, LLC?

A.    I don't know.  I don't recall.

Q.    Okay.  So as corporate HR for the facilities that you did list and entities that

you did list, are you in charge of making decisions about compensation for employees?

A.    No.

Q.    Who's in charge of making decisions regarding compensation for employees?

A.    That would be our CEO and COO.

Q.    And who is that?

A.    Matt Moman and Julie Sulik.

Q.    Can you spell Julie's last name?

A.    S-U-L-I-K.

I have a clarifying question. When you say making decisions regarding compensation, are you talking about the wage scale?

Q.    Any decision regarding compensation, like payment of overtime, nonpayment of overtime, lunch deductions, things like that.

A.    I think -- okay.  Well, I did not understand your initial question then.  I thought you were asking about a wage scale when you referred to compensation decisions.

Q.    Okay.

A.    When it comes to policy, we all

collaborate.  So, yes, I would be involved in those decisions.

Q.    Okay.  So something that was applicable to, say, Cypress Opco, LLC -- Capstone-Cypress Opco, LLC, would be applicable to Capstone Perryton or Capstone Hughes Springs; correct?

A.    Yes.

Q.    Right.  So effectively, your concern is to make sure that the compensation practices are the same across all of the companies, and that they're uniform; is that correct?

A.    Yes.

Q.    Okay.  Do you know if there are any facilities under the Capstone Healthcare umbrella that don't have the word "Capstone" in them?

A.    I don't know all of the legal entity names.  I refer to our locations by typically just their d/b/a.  So no.

Q.    So there could be, but you just don't know?

A.    Correct.

Q.    Okay.  Are there any DBAs or

assumed names that are under the Capstone Healthcare umbrella that don't have the word "Capstone" in them?

A.    Just Cypress Place Assisted Living.

Q.    Okay.  What I want to try to do is open up Exhibit No. 2.

MR. WELMAKER:  And so when I flash these up, Elizabeth -- let's go off the record for one second, if that's okay.

MS. REED:  Sure.

(A short break was taken.)

(Whereupon, Plaintiff's Exhibit 2 was marked for identification.)

Q.    (By Mr. Welmaker) So Ms. Darnell, what I think you have in front of you is what I've marked as deposition Exhibit No. 2, and it's an arbitration agreement that has at the bottom Bates stamps from 832 to 837.  Can you see that?

A.    Yes.

Q.    Okay.  Have you seen this agreement before?

A.    Yes.

Q.    Okay.  And when was the first time that you saw this agreement?

A.    It would have been -- I don't have an exact date.

Q.    You can just ballpark it.

A.    It would have been just -- okay. It probably would have been, you know, shortly after my hire.  So I would say probably 2019.

Q.    Okay.  So on the very first page, Bates stamped 832, it says, Overview, colon. And then "Capstone Healthcare" is typed in. Do you see that?

A.    I do.

Q.    Okay.  And then the very last -- second to last page, Bates stamped 836 --

A.    Yes.

Q.    -- There's a little block down there that says, Southwest LTC-Austin ALF, Inc.  Do you see that?

A.    Yes.

Q.    Okay.  So I want to start on that page.  Can you tell me, who is Southwest LTC-Austin ALF, Inc.?

A.    I can tell you that Southwest

LTC is a former employer of me and Matt's --
Moman.

        Q.      Okay.  So both you and Mr. Moman
worked for Southwest LTC-Austin ALF, Inc.?

        A.      No, we worked for Southwest LTC.

        Q.      Okay.  I've looked at the
different entities that have Southwest LTC in
their name.  There's Southwest LTC-Austin ALF,
there's Southwest LTC-San Antonio ALF, and
then there's another Southwest LTC that has
another city name in it.  Did you or Matt work
for any of those three specific entities?

        A.      I can only speak for myself on
this.  I did not.

        Q.      Okay.  So you think the entity
that you used to work for was just called
Southwest LTC; is that correct?

        A.      Yes.

        Q.      Okay.  And when did you work for
Southwest LTC?

        A.      Oh, let's see.

        Q.      You can just ballpark it.

        A.      Okay.  I just want to make sure
I get the years.  I've got to do the math
real quick in my head.  Let's see.  2012 is

when I ended my employment with them, and I worked for them for about five years.

Q.    Okay.  In what capacity?

A.    I did -- compliance manager was my title.

Q.    Okay.  And so the Southwest LTC that you worked for, do you know if it's d/b/a or assumed name was Colonial Gardens of Austin?

A.    I know that it was not that d/b/a.

Q.    Okay.  What city did you work for Southwest LTC in?

A.    Plano.

Q.    Okay.  And did you work in Plano at Southwest LTC with Mr. Moman?

A.    For a brief time.

Q.    And what was his position at that time?

A.    I don't recall his exact title.

Q.    What was he doing?

A.    I -- he was working with the CFO.

Q.    Okay.  Is there any relationship between Capstone-Cypress Opco, LLC, and

Southwest LTC-Austin ALF, Inc.?

A.      No.

Q.      Is there any relationship -- go ahead.

A.      That was all.

Q.      Oh, okay.  Is there any relationship between any of the Capstone Healthcare affiliates and Southwest LTC-Austin ALF, Inc.?

A.      No.

Q.      Okay.  Do you know where this agreement came from?

A.      It was a template that we utilized.

Q.      And when you say "we," who do you mean?

A.      Capstone.

Q.      Okay.  How did Capstone get it?

A.      From our tenure at Southwest.

Q.      Okay.  So you just used a form that you obtained from a prior employer to distribute to the Capstone Healthcare affiliate employees; is that correct?

A.      We used it as a template.

Q.      Is there a reason why you kept the

name Southwest LTC-Austin ALF, Inc. on there?

A.    So that was a print error.  We had redacted that.  As you can see, it says Capstone Healthcare beneath it.  So that redaction didn't stick when we printed the document.

Q.    Who wrote in Capstone Healthcare underneath the words "d/b/a Colonial Gardens of Austin"?

A.    I don't know.

Q.    How long did Capstone or the Capstone affiliates utilize this particular agreement?

A.    I don't have the exact date that we updated the agreement.  But that agreement may have a date on it.

Q.    Yeah.  Right above Southwest LTC, it says, "Adopted effective this first day of April, 2017."  Do you see that?

A.    Yes.

Q.    Okay.  And that's on Capstone Bates Stamped 836; correct?

A.    Yes.  Yes.  Yes.

Q.    Okay.  So was Capstone-Cypress

Opco, LLC even in business as of April, 2017?

A.    No.

Q.    Okay.  Were any of the Capstone Healthcare affiliates that you're aware of in business as of April 2017?

A.    Possibly.

Q.    Okay.  Do you know which ones?

A.    It was possibly a now divested location.  It was Capstone-Ennis.

Q.    Okay.  Aside from that, were there any others that were in existence in 2017?

A.    Not to my knowledge.

Q.    Okay.  And then if you go back to the first page of it on Bates Stamp 832, where it says, "Overview, Capstone Healthcare," and then there's a big blank, do you know who wrote in or typed in the words "Capstone Healthcare" there?

A.    No.

Q.    Okay.  Who signed this particular arbitration agreement on behalf of any of the Capstone Healthcare entities?

A.    Matthew Moman.

Q.    Okay.  So if you go back to 836, Bates Stamp 836, there is no signature on

here; is that correct?

A.    Correct.

Q.    And to the best of my knowledge --
and I'm sure your counsel will correct me if
I'm wrong -- all of the arbitration agreements
with this Southwest LTC Austin ALF, Inc. on
them are unsigned.  Do you agree with that, or
do you know?

A.    I would have to look before I
agreed with that.

Q.    So is it your testimony that
Mr. Moman signed some of these?

A.    I don't know.  My testimony is
that I would have to go back and look at all
of them.

Q.    Okay.  On the second page, which
is Bates Stamped Capstone 833, do you see
that?

A.    Yes.

Q.    Okay.  Under arbitration
procedures, about halfway down the page, it
states, "Written demand on the company or one
or more of its officers, directors,
shareholders, employees, agents, affiliates,
or benefit plans must be sent to Colonial

Gardens of Austin, Attention, Nursing Home Administrator, 3706 Adelphi Lane, Austin, Texas 78727."

Actually, the sentence above says, The party seeking arbitration under this agreement must make written demand at or to Colonial Gardens of Austin with the 3706 Adelphi Lane address.  Do you see that?

A.    I don't see "at."  I see demand for arbitration.  Is that the correct sentence I'm supposed to be looking at?

Q.    Yeah.  The -- under arbitration procedures, under required notice of all claims, it says, "The party seeking arbitration must make a written demand for arbitration on the other party within the applicable statute of limitations, period." Then it says, "Written demand on the company or one or more of its officers, directors, shareholders must be sent to Colonial Gardens of Austin, Attention, Nursing Home Administrator at 3706 Adelphi Lane, Austin, Texas."  Did I read that correctly?

A.    Yes.

Q.    Okay.  So under this arbitration

agreement, is it your -- or the company's position that in order to invoke arbitration, a demand must be made on Colonial Gardens of Austin at 3706 Adelphi Lane in Austin, Texas?

MS. REED:  Objection, form.

THE WITNESS:  No.  That was intended to be redacted and printed out in error.

Q.    (By Mr. Welmaker) Okay.

So where in this agreement that we're looking at now that's been marked as Exhibit No. 2, does it specify that it applies to employees of Capstone-Cypress Opco, LLC?

A.    Can you repeat that question for me?

Q.    Sure.

Where in this exhibit that we've marked as Exhibit No. 2, does it specify that this arbitration agreement applies to employees of Capstone-Cypress Opco, LLC?

A.    So on page one or 000832, it says, "Capstone Healthcare hereinafter simply the company."  So anytime that the company is referenced here, we're referring to Capstone Healthcare.

Q.    Okay.  Is Capstone Healthcare an entity or --

A.    Capstone Healthcare is the common name we use for all of our communities.

Q.    Okay.  Has it been registered anywhere as an assumed name or a d/b/a?

A.    I'm not sure.

Q.    Okay.  And so is it the company's testimony that the words "Capstone Healthcare" refers to all of the various Capstone, LLC entities, including Capstone-Cypress Opco, LLC?

A.    Yes.  That's my understanding.

Q.    Okay.  Does it say that anywhere here in this document?

A.    Does it say what anywhere here in this document?  I just want to make sure I'm understanding.

Q.    Does it say anywhere in this document that Capstone Healthcare specifically applies to any of the other Capstone corporate entities, including Capstone -- Capstone-Cypress Opco, LLC?

A.    I would have to read through

this in detail.

Q.    Okay.  We can give you time to do that.

A.    Okay.  Do I need to --

MS. REED:  No.  You just go ahead and read.

THE WITNESS:  Oh.  Oh, I'm sorry.  Okay.  Okay.  So on page 2 or 000833 -- oh, gosh, let me find it.  It talks about, "The arbitration policy and procedures binds and benefits both the employee and the company, as well as their successors, subsidiaries, and affiliates."

MS. REED:  Do you want to call out the specific heading?

THE WITNESS:  The specific heading is the binding on others.

Q.    (By Mr. Welmaker) Okay.  I see that on 833.

A.    Yes.

Q.    Where does it mention any of the other Capstone corporate entities or Capstone-Cypress Opco, LLC?

A.    It says here, "The arbitration policy procedures binds and benefits both the

employee and the company."  So the company being referred to as Capstone Healthcare. "As well as their successors, subsidiaries, and affiliates."  And then it goes on to say "And any of their officers, directors, shareholders, partners, owners, employees, and agents of any company, employee benefit plan and its administrators."  So it would fall under that umbrella of various listings here.

Q.    Okay.  So -- but what is Capstone Healthcare?  Is it -- is it a corporate entity?  Is it a d/b/a?  Is it -- I mean, what is it?  Where is it listed?

MS. REED:  Objection, form.

THE WITNESS:  It's the common phrase we use for our communities.  They're -- they're part of Capstone Healthcare.

Q.    (By Mr. Welmaker) Okay.

Is Capstone Healthcare registered as an entity doing business in Texas?

MS. REED:  Objection, form.

THE WITNESS:  I don't know.  I would have to get the exact documentation.

Q.    (By Mr. Welmaker) Okay.

So other than the binding on others provision on Capstone 833, is there any other provision of this arbitration agreement that would apply to any of the other Capstone corporate entities or Capstone-Cypress Opco, LLC?

A.    May I continue reading?

Q.    Sure.

A.    Okay.  That's the only place I'm seeing it.

Q.    Okay.  Let me ask you one more question about Capstone Healthcare.  That's on page 832 at the top.  Is Capstone Healthcare a Texas entity?

MS. REED:  Objection, form.

THE WITNESS:  We only operate in Texas.

Q.    (By Mr. Welmaker) Okay.

Do you know if it's a Texas entity, though?

A.    I don't know.  I just know that we only do business in the state of Texas.  As far as a specific entity, I don't know.

Q.    Do you know if it's chartered in Texas?

A.    I don't know.

Q.    Can you look at the very last page, which is Bates Stamped 837?

A.    Yes.  Yes.

Q.    Who created this document?

A.    I don't know.

Q.    Was it a part of the forms that you-all used from Southwest LTC?

A.    I believe so.

Q.    But you don't know for sure?

A.    I don't know for sure, but I do believe so.

Q.    What makes you believe that?

A.    I believe that it's an extension of the pages above.

Q.    But why do you believe that?

A.    Just based on the formatting and the structure of the document. That is just the separate signature page to the policy above is my -- is the only reason I --

Q.    Okay.  Let's look at Exhibit 3.

      MS. REED:  Doug, while you're at a transitioning point, we received the -- can we go off the record really quick?

MR. WELMAKER:  Sure.

MS. REED:  Okay.

(A short discussion was held.)

(Whereupon, Plaintiff's Exhibit 3 was marked for identification.)

Q.      (By Mr. Welmaker) So I want to direct your attention to what is marked as Exhibit No. 3, which is another arbitration agreement Bates stamped 838 to 842.  I actually accidentally put an extra page on it, so you can just ignore that.  Do you see that in front of you or on your screen?

A.      Yes, I do.

Q.      Okay.  Who created this agreement?

A.      I retyped this agreement from the template.

Q.      So from Exhibit No. 2?

A.      Yes.

Q.      And when was it put into use?

A.      It says -- at the bottom of the page, it says, Effective September 2024.

Q.      Okay.  Is that about when you retyped it?

A.      Yes.

Q.    And did you have a motivating reason to retype this and circulate it?  What made you do that?

A.    I wanted a nice, clean, clear-to-read version.  And we typically review -- we make it best practice to review all of our policies annually, at the very least.

Q.    And how long had Exhibit No. 2, the one we just reviewed, been in circulation?

A.    It would have to have been up until the effective date of this document, I believe.

Q.    So possibly for three to four years?

A.    Possibly.

Q.    Okay.  So at the top, it says, "Overview, Capstone Healthcare and affiliates. And affiliates (hereinafter simply "the company.")  Do you see that?

A.    I do.

Q.    Okay.  Where in this agreement does it mention any of the Capstone corporate entities or the corporate LLCs or Capstone-Cypress Opco, LLC by name?

A.    We don't have them by name.  We have them as affiliates.

Q.    Okay.  Is affiliates anywhere in this agreement defined?

A.    May I look?

Q.    Sure.

A.    I do not see a definition.

Q.    Okay.  Is there any other reference to any of the other Capstone corporate entities or Capstone-Cypress Opco, LLC in this document?

A.    No.

Q.    Okay.  Can you turn to the document that's Bates stamped Capstone 842 --

A.    Yes.

Q.    -- please?  The second to last page.  And at the top, it says, "Capstone Healthcare and its affiliates," and then "by." And then there's a signature.  Can you tell me whose signature that is?

A.    Yes.  It's Matthew Moman.

Q.    Okay.  And so is he president of all the Capstone corporate entities and LLCs, including Capstone-Cypress Opco, LLC?

A.    I assume so.  I don't have the

exact structure of everything.

Q.    Okay.  But you don't know for sure?

A.    I don't know for sure.  I assume so, yes.

Q.    Have you signed this second agreement?

A.    Have I signed it in what capacity?

Q.    In your capacity as an employee.

A.    I was hired on in 2019.  So I would not have signed this version.

Q.    Did you sign the prior version that we looked at?

A.    I believe so.

Q.    And so that's still the active version that you have?

A.    For myself, yes.

Q.    Okay.  All right.

I want to switch gears a little bit -- what system or method did the Capstone Healthcare entities use to track hours worked by hourly employees?

A.    We use isolved.

Q.    And how long have you been using

isoft (sic)?

A.    I believe since 2022.

Q.    Okay.

A.    I believe that's when we transitioned, yes.

Q.    What did you transition from?

A.    Paycom.

Q.    And when you did the transition, that was for all of the Capstone Healthcare companies?

A.    Yes.

Q.    Okay.  And that includes Capstone-Cypress Opco, LLC?

A.    Yes.

Q.    Okay.  And so when you use isolved, how do you clock in and clock out on that?

MS. REED:  Objection, form.

THE WITNESS:  It's isolved.

Q.    (By Mr. Welmaker) Oh, isolved?

A.    Yeah.  It's a biometric fingerprint.

Q.    So you clock in by scanning your fingerprint, and you clock out the same way?

A.    Yes.

Q.    Okay.

MS. REED:  Douglas, can she take down Exhibit 3 and go back to full screen?

MR. WELMAKER:  Yeah.  Yeah.

MS. REED:  Sorry.  I just wanted to make sure.  There you go.  We're good.

Q.    (By Mr. Welmaker) Okay.

With respect to isolved, was there any kind of a rounding policy utilized for clock-in or clock-out times?

A.    No.

Q.    Okay.  With isolved, does it come with the ability to edit employee time?

A.    We can make corrections and updates, yes.

Q.    Okay.  Can you dock time from employees?

A.    No, we don't dock time.  We just make corrections.

Q.    Okay.  What do you consider to be a correction?

A.    If they had a double punch or a missed punch, then we'll go and add in their time.  Or if their finger scanned twice, it can throw time off, and we'll go have to

remove that second punch, like the second in-punch.

Q.    Okay.  Did Capstone Healthcare have a policy of automatically deducting 30 minutes a day for lunch for its hourly employees?

A.    Yes.

MS. REED:  Objection, form.

Q.    (By Mr. Welmaker) And what was your answer?

A.    Yes.

Q.    Okay.  And that applied across the board to all of the Capstone Healthcare companies?

A.    For hourly employees, yes.

Q.    Okay.  And was that 30 minutes automatically taken out of everybody's time every day?

MS. REED:  Objection, form.

THE WITNESS:  Yes.  If they worked at least five hours.

Q.    (By Mr. Welmaker) Okay.

Anything lower than five hours, and there's not going to be an auto deduction

of a 30-minute lunch?

A.      That is correct.

Q.      Okay.  Is that still the policy today?

A.      Yes.

Q.      Okay.  So if an employee works through lunch, they're still going to have 30 minutes deducted from their time?

MS. REED:  Objection, form.

THE WITNESS:  Yes.  They need to complete a missed punch form and submit it to their supervisor, and we will have that break removed.

Q.      (By Mr. Welmaker) Okay.

And if they forget to do a missed punch form, then -- and they worked through lunch, that docking is going to still apply; correct?

A.      We ask that the employee let us know if there are any errors in their time so that we can go fix them.  And we will retro adjust if the supervisor signs off that says, hey, they forgot to give me this form last pay period, we will adjust on the next one or however many subsequent ones to make that

correction.

Q.    Okay.  So if you have an employee, an hourly employee that's working through lunch every day during a one-year period, every single day during that one-year period, they're going to have to submit a missed punch sheet; is that correct?

A.    Yes.

Q.    Okay.  Do you know if the submission of missed punch sheets was ever discouraged by supervisors?

A.    It should not have ever been, no.

Q.    Have you received any complaints about supervisors discouraging submission of missed punch sheets?

A.    I have never received a complaint about that.  I do not recall ever receiving a complaint about that.

Q.    Who implemented the policy of deducting 30 minutes per day for lunch?

A.    Like a -- when you say "who?"

Q.    Like was it a specific person?

A.    No, it was just the company policy.

Q.    How did that company policy originate?

A.    It originates with a CMS requirement for 30-minute breaks.

Q.    Okay.  And what does CMS stand for?

A.    The Medicare and Medicare (sic) Services.

Q.    And so is it your testimony that Medicare and Medicaid Services require you to take a 30-minute deduction for lunch from your hourly employees per day?

A.    I believe that that is the correct entity that I'm referencing, yes.

Q.    Okay.  Well, even if it's not necessarily technically correct, is it your testimony that there's some sort of a federal agency that mandates the deduction of 30 minutes per day for lunch for hourly employees?

A.    For reporting purposes, yes. For payroll-based journal reporting purposes, yes.

Q.    When you say "for reporting purposes," what do you mean by that?

A.      For payroll-based journal reporting, yes.

Q.      What is payroll-based journal reporting?

A.      Hourly reports that have to be submitted.

Q.      And who are they submitted to?

A.      I don't submit them, but if I'm remembering correctly, I believe it's CMS.

Q.      And again, what does CMS stand for?

A.      The Centers for Medicare and Medicaid Services.

Q.      Okay.  And that rule that you're saying, CMS has issued that is applicable to the Capstone Healthcare entities, where is that published, or how is that disseminated to the Capstone Healthcare affiliates?  Can you --

A.      I'm not understanding the question where that's published.

Q.      How did CMS communicate that rule to the Capstone affiliates?

A.      I don't think it was directly communicated.  I think it's a rule that

healthcare entities are aware of.

Q.      So is it your testimony that all healthcare entities must dock 30 minutes a day for lunch for their hourly employees?

A.      No.

MS. REED:  Objection, form.

THE WITNESS:  That's not my testimony.

MS. REED:  Sorry.  Go ahead and repeat your answer.

THE WITNESS:  Oh, sorry.  No, that is not my testimony.

Q.      (By Mr. Welmaker) Okay.  So --

A.      I don't -- I don't know what their obligations are.  But I know that for us, that we follow that requirement.

Q.      And do you know if that CMS rule is applicable to just specific types of healthcare organizations?

A.      I don't know.  I only know regarding our line of business.

Q.      Okay.  And did somebody at Capstone Healthcare bring that CMS rule to your attention, or how did you find out about it?

A.    No one particularly brought it to my attention.  It's just pulling those reports for submission for payroll-based journals every quarter.

Q.    And so it's going to be the isolved program that's going to auto-deduct 30 minutes a day from the hourly employees?

A.    Yes.

Q.    Okay.  And before that, the Paycom system that you were using -- did the Paycom system auto-deduct the same 30 minutes from hourly employees every day?

A.    I do not know.  We haven't used that system in so long.  I would have to go back and look to see if that happened.

Q.    Okay.  With respect to isolved, does it maintain an audit trail or any kind of a log that shows what corrections were made to employee time?

A.    Yes.

Q.    Have you seen that log or the audit trail before?

A.    I have.

Q.    Who has access to that?

A.    I have access to that.  There

may be a few HR managers who have access to
that report.  I can't speak exactly who has
access to that exact report, but I believe it
would be me and the HR managers.  Possibly
the administrators would have access to that
report as well.  I'm not sure.

Q.      Do you know if anyone from the
Capstone Healthcare companies or any of the
affiliates ever consulted with outside counsel
for help interpreting that rule that you're
saying requires a 30-minute lunch deduction
from hourly employees?

MS. REED:  Objection, form.

THE WITNESS:  I do not know the
answer to if anyone consulted with counsel
regarding that.

Q.      (By Mr. Welmaker) Who would know
the answer to that?

A.      Counsel.

Q.      That works at any of the Capstone
Healthcare affiliates?

A.      Possibly Matt Moman.

Q.      To your knowledge, is there anyone
else at Capstone Healthcare or any of its
affiliates that would have more knowledge than

you do about any of the topics that we've discussed today?

A.    I'm sure there's people with more knowledge of the structure of the legal entities.  That's not something I deal with typically.

Q.    What about any of the other topics that we've talked about?

A.    That we've talked about thus far, like I said, possibly regarding the legal entities.  But the topics that we've yet to discuss, I think I would be the primary person.

Q.    And when you say "the topics that we've yet to discuss," what are you talking about?

A.    The Exhibit 1.

Q.    You mean that we've already discussed?

A.    I don't -- I didn't realize we had gone through all of Exhibit 1 yet-- all of the questions on Exhibit 1.

Q.    Oh, you're talking about the deposition -- the 30B6 deposition?

A.    Yes, yes.

Q.      Okay.  I'm sorry.

A.      Yeah.

MR. WELMAKER:  Yeah.  I told Elizabeth that I was going to try to keep this short, so I'm just going to reserve the remainder of questions until trial.

MS. REED:  Okay.  I just have a couple of quick clarifying questions.

EXAMINATION BY MS. REED:

Q.      So, Ms. Darnell, you testified earlier as to the auto deduction applying for hourly employees that work a day.  Is "a day" the correct increment of time for that policy to apply?

A.      It's at least five hours.

Q.      Okay.  And we discussed about the CMS, the Centers for Medicare and Medicaid Services guidelines and the type of healthcare entities that it may apply to.  And I understand that you don't have knowledge about all the different healthcare entities that it may apply to.  But is it fair to say that Capstone Healthcare entities must follow those guidelines because they treat Medicaid and Medicare patients?

A.    Yes, we do.  Yes, that is correct.

Q.    And is it fair -- is it correct to say that you and I attempted to access your payroll information in order to identify the exact name of the entity that you work for?

A.    Yes, we did.  And it kept putting me in circles.  I could not get logged in.

MS. REED:  I will reserve the remainder of our time for the time of trial.

MR. WELMAKER:  Okay.  Elizabeth -- let's go off the record for a second.

(A short discussion was held.)

RE-EXAMINATION BY MR. WELMAKER:

Q.    Okay.  I'm looking at the Operations Transfer Agreement that Ms. Reed has sent me.  And we are going to mark this as Deposition Exhibit No. 4.  And I just have a couple of questions about this.

Ms. Darnell, have you ever seen this before as opposed to -- I mean, let me rephrase it.

Have you seen this agreement before prior to two hours from now?

(Whereupon, Plaintiff's Exhibit 4 was marked for identification.)

THE WITNESS:  No.

Q.    (By Mr. Welmaker) Okay.

Under Recitals on page 1, paragraph A, it refers to Capstone-Jefferson Propco, LLC.  Do you see that?

A.    Yes.

Q.    Are you familiar with that entity?

A.    Somewhat.  It's a familiar name.

Q.    Okay.  Is it currently one of the Capstone Healthcare Affiliates?

A.    I don't believe so.

Q.    Are you familiar with, in paragraph B of the recital, an entity called Cypress Place RE 2015, LLC?

A.    I'm not familiar with that entity.

Q.    Okay.  And then in paragraph C, it references, Civitas Senior Healthcare, LLC. Are you familiar with Civitas?

A.    I am familiar with Civitas as a company.

Q.    Okay.  And why is that?

A.    I know their name in long-term care.

Q.    Do you deal with Civitas in your capacity as an employee of Capstone Healthcare?

A.    No.

Q.    Okay.  And so this is a 34-page document that references the sale of the property located at 100 West Jefferson from the companies listed in paragraphs B and C to Capstone-Jefferson Propco, LLC; is that correct?

A.    I'm sorry.  Can you -- can you direct me exactly where you're looking?  You said B and C?

Q.    I'm sorry.  Back on page one.

A.    Okay.  On page one, I see B and C.  And then you referenced which specific entity?

Q.    It looks like the entity in A, Capstone-Jefferson Propco, LLC, is purchasing the property from the entities listed in paragraphs B and C.  Do you agree with that?

A.    Let me read it really quickly.

So it looks like, from what I

understand in A, that the Capstone-Jefferson Propco entity is purchasing an entity commonly known as Cypress Place Assisted Living.

Q.    Referenced in paragraph B; right?

A.    I see that referenced in paragraph B, yes.

MR. WELMAKER:  Okay.  Okay.  I don't have any further questions.

MS. REED:  I have just a couple.

RE-EXAMINATION BY MS. REED:

Q.    Ms. Darnell, after review of this Operations Transfer Agreement, are you able to clarify some of your testimony that you provided earlier today?

A.    Yes.

Q.    And is one of those clarifications when Capstone-Cypress Opco, LLC began operations of the facility located at 100 West Douglas Street, Jefferson, Texas?

A.    Yes.  January 1st, 2021.

Q.    And can you point us where in the operations transfer agreement you find that information?

A.    Yes.  On page 4 under D is where

I'm seeing that date.

Q.    And when you say page 4, you're talking about section 6 titled "employees" and then subsection D titled "excluded employment liabilities"?

A.    Yes, that is correct.

Q.    And also based on this Operations Transfer Agreement, are you able to clarify when -- around when, estimation, Capstone-Cypress Opco, LLC was formed?

A.    It looks to have been formed in late 2020 for the purpose of acquisition on January 1st, 2021.

MS. REED:  I will reserve the rest of my time for trial.

RE-EXAMINATION BY MR. WELMAKER:

Q.    Ms. Darnell, can you tell me where you got the information that you just testified to that Capstone-Cypress Opco was formed in late 2020?

A.    Yes.  Give me one moment.  I see at the very top, it says December -- the very top says December 31st, 2020.

Q.    What page?

A.    Page one.  And let me see if I

can find any other dates that might -- that's the primary date that I am utilizing.

MR. WELMAKER:  Okay.  All right. I have no further questions.

MS. REED:  I have no further questions.

(The deposition concluded at 12:39 p.m.)

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of Alabama, being empowered to administer oaths and affirmations remotely pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.  Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.      DATED:      2/11/2026   *Cindy C. Jenkins*

_____

Cynthia C. Jenkins, CCR 470

DEPOSITION ERRATA SHEET


DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that
I have read the entire transcript of
my Deposition taken in the captioned matter
or the same has been read to me, and
the same is true and accurate, save and
except for changes and/or corrections, if
any, as indicated by me on the DEPOSITION
ERRATA SHEET hereof, with the understanding
that I offer these changes as if still under
oath.
Signed on the _____ day of _____,
20___.


_____
        Amanda Darnell

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

            Amanda Darnell

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

     SIGNATURE:_____DATE:_____

          Amanda Darnell





